# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SALVADOR QUINTERO, ) | |
| ) | |
| Plaintiff, ) | Case No. 13-cv-6249 |
| ) | |
| v. ) | Judge Robert M. Dow, Jr. |
| ) | |
| CANADIAN PACIFIC RAILWAY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's motion for summary judgment [33]. For the reasons set forth below, Defendant's motion for summary judgment [33] is granted. The case is terminated and judgment will be entered in favor of Defendant.

## I. Background[1]

### A. Plaintiff's Employment History / Essential Functions of a Carman

Defendant Soo Line Railroad Company d/b/a Canadian Pacific is a Minnesota-based railroad company. One of Defendant's yard facilities is located in Franklin Park, Illinois. Plaintiff began working for Defendant as a Carman at the Franklin Park facility on or about October 20, 2003. The general responsibilities of a Carman include "performing inspections and repairs all around, inside of, on top of, between, and under rail cars entering and leaving the yard," and "[r]espond[ing] to derailments to repair and re-rail cars." [35-2, at 1.] Carmen are required to secure transportation to and from work, to wear certain safety equipment while at work, to maintain a valid driver's license, to possess a certain level of literacy so as to ensure compliance with written regulations, and to pass a pre-employment physical examination. [*Id.*] On a day-to-day basis, a Carman could perform a variety of tasks, including:

---

[1] The Court takes all relevant facts primarily from the parties' Local Rule ("L.R.") 56.1 statements.

- inspecting, building, repairing, maintaining, and upgrading rail cars;
- testing, inspecting, and repairing various components of rail cars, including pneumatic brake systems, underframes, doors and locks, etc.;
- operating various power tools, saws, presses, punches, torches, etc.;
- operating swing lifts to load and unload containers and trailers from rail cars;
- performing various tasks associated with wrecking or derailments of rail cars;
- operating machines and equipment, including trucks, tractors, car pullers, etc.;
- performing tasks associated with metal working, including welding, fusing, brazing, soldering, tinning, leading, metalizing, bonding, cutting, and burning.[2]

And while on the job, a Carman would:

- work outdoors a majority of the time with exposure to marked changes in temperature and humidity such as extreme heat, cold, ice, rain and snow;
- bend, stoop and twist FREQUENTLY;
- squat, crawl, climb ladders to the top of box cars, reach above shoulders, crouch, kneel, and balance OCCASIONALLY;
- push, pull, and lift and carry up to 50 lbs. CONTINUOUSLY;
- lift and carry 50 to 100 lbs. with another person helping FREQUENTLY;
- Use both feet to operate foot controls;
- Use both hands to grasp and manipulate tools, equipment and parts;
- Be trained and certified to operate welding equipment;
- Be trained to operate a forklift;
- Be subject to work long hours if responding to derailments or other emergencies;
- Be subjected to constant noise;
- Be subjected to solvents, grease, oils and cleaning agents.[3]

During an average eight-hour shift, Plaintiff inspected and serviced anywhere from 900 to 1400 freight cars. Carmen often work alone, or on occasion work in pairs. Plaintiff described the Carman position as a "safety sensitive" one that required him to "keep [his] eyes open" at all times to ensure safety of himself and others. [38, ¶ 34.]

---

[2] This is an abbreviated list derived from a more comprehensive list that appears in the collective bargaining agreement governing Plaintiff's employment. [See 35-13, at 28–30.]

[3] This list stems from a one-page document describing the position of Carman that is divided into three parts: (1) description of duties, (2) essential functions/requirements, and (3) a section titled "On the job you would." [35-2, at 1.]

On December 17, 2007, Plaintiff began seeing a physician for treatment of anxiety, panic reactions, and sleeplessness. Plaintiff took a leave of absence from work from June 21, 2012 until November 1, 2012 because of his stress, anxiety, and panic attacks. Plaintiff was authorized to return to work as of October 30, 2012, and began working a few days later, on November 4, 2012. But on that day, Plaintiff unilaterally withdrew himself from work and began a second leave of absence as of November 5, 2012, which lasted until his termination went into effect on February 4, 2013. Plaintiff has not been employed since that time.

On November 13, 2012, Defendant issued Plaintiff a notice to attend a formal disciplinary hearing regarding Plaintiff's "alleged continued unauthorized absence beginning November 9, 2012." [35-11; 38, ¶ 66.] The hearing was conducted on January 14, 2013, and Plaintiff was officially terminated on February 4, 2013. Defendant alleges that Plaintiff was terminated for violating it General Code of Operating Rules for MS-US Employees, Rule 1.15 (Duty – Reporting or Absence), which essentially says that employees need to come to work and that they are subject to dismissal if they fail to do so. [35-4, at 9; 35-12, at 1.] Plaintiff says that he was fired "because of his disability." [38, ¶ 67.]

### B. Plaintiff's Disability

During his first leave of absence from June 21, 2012 until November 1, 2012, Plaintiff suffered from paranoia, fearing harm to himself or his family. He experienced poor concentration as well as numbness and shaking throughout his body. He was afraid (and physically incapable) of driving. As of September 2012, Plaintiff suffered from panic attacks on a daily basis,[4] multiple times per day. During these attacks, Plaintiff felt like he could not breathe, he felt like he was

---

[4] Between September and December of 2012, Plaintiff was treated by Dr. Slawomir Puszkarski, a board-eligible psychiatrist. During his initial visit with Dr. Puszkarski, Plaintiff explained that he felt depressed and nervous or anxious, and he appeared to Dr. Puszkarski as if he was having panic attacks and depression. Dr. Puszkarski found that Plaintiff had 95% of the symptoms associated with panic attacks.

3

"going nuts," he could not think, and he felt like he was going to have a heart attack. Often he was unable to move during an attack. Plaintiff's hands shook during his panic attacks, such that at times he was unable to hold a glass of water. He was terrified to leave his house. Plaintiff's symptoms continued without improvement throughout his leave of absence.

Physicians monitored Plaintiff's condition and his ability to return to work throughout his leave of absence. During an October 23, 2012 visit with Dr. Puszkarski, Plaintiff appeared "less anxious." On October 26, 2012, Dr. Puszkarski issued a letter releasing Plaintiff to return to work, and Defendant authorized Plaintiff to return to work as of October 30, 2012. Plaintiff returned to work a few days later, on November 4, 2012, but determined the he was unable to perform his job duties due to his panic attacks, anxiety disorder, and depression issues, so he removed himself from service, thus beginning his second leave of absence.

On November 15, 2012—during Plaintiff's second leave of absence—Plaintiff visited Dr. Puszkarski again, where it was determined that his depression and anxiety had worsened. Physicians monitored Plaintiff's condition and his ability to return to work throughout his second leave of absence. Plaintiff's symptoms escalated again in January and March of 2013—he continued having panic attacks and anxiety symptoms daily, but at a level of severity greater than what he was experiencing in November of 2012. Plaintiff's absence from work continued indefinitely. There is no indication that Plaintiff's symptoms changed in any material way prior to his termination on February 4, 2013. Plaintiff was not fit to work without accommodation until January or February of 2014, approximately one year after his termination.

### C. Plaintiff's Ability to Perform His Job Duties

Plaintiff admits that he could not perform the functions of his own job during his leaves of absence without a reasonable accommodation. [38, ¶ 40.] There is no evidence that Plaintiff

requested a reasonable accommodation while he was still employed by Defendant. Instead, Plaintiff claims that he was never told, and never knew, that employees could request or receive a reasonable accommodation under the ADA.[5]

Reflecting on his employment with Defendant, Plaintiff testified that the accommodation that he needed at the time was an indefinite leave of absence. [38, ¶ 41.] More specifically, he said that he needed the right medication to straighten out his disability, and that he needed to be off of work indefinitely until his medication was sorted out. [38, ¶ 41.] In briefing the present motion, Plaintiff now emphasizes a different portion of his deposition testimony, claiming that a reasonable accommodation would have been to allow him to take a break when he felt a bout of anxiety coming on, citing his testimony that "sometimes" he could feel a panic attack coming on. [40, at 3; 39-4, at 10–11.]

### D.    Plaintiff's Right to An Indefinite Leave of Absence

Plaintiff alleges that Defendant's own policies and the governing collective bargaining agreement allowed Plaintiff to remove himself from service for indefinite periods of time, and that, in doing so, he was on an "approved indefinite leave" where he was "protected" from termination. [40, at 5–7.] Defendant disagrees, arguing that the cited policies only outline procedures surrounding medical-related leaves of absence, they do not *authorize* indefinite leaves of absence. [44, at 15–17.]  The Court is compelled to unpack this dispute based on its relevance to this motion.

---

[5] Defendant alleged in its statement of facts that it has an Equal Employment Opportunity Policy in place [38, ¶ 19 (Policy 1301)], and it provided a copy of that policy [35-5]. Plaintiff denied that statement, claiming that Defendant failed to provide any foundation for the policy. In response, Defendant submitted an affidavit from Amanda Cobb, Defendant's "Advisor, Employee Relations," who testified regarding her familiarity with Defendant's policies, and confirmed that Policy 1301, dated February 2012, is Defendant's Equal Employment Opportunity Policy. [44-3, ¶¶ 7–8.] That policy discusses Defendant's procedures regarding requests for reasonable accommodations. [35-5, at 3–4.]

5

Regarding Defendant's policies, Plaintiff relies on Defendant's Return to Work policy. [See 35-6, at 1–4.] The policy says that "[w]hen an employee is unable to work due to medical reasons, the employee has an obligation to provide supporting documentation on the length of expected absence so the supervisor can effectively plan to accomplish the work necessary during the absence." [35-6, at 1.] The policy does not set a maximum amount of time that an employee can remain on medical leave, and contemplates absences exceeding 90 days. [35-6, at 2.] The gist of the policy is about communication, explaining that "[e]mployees are responsible for submitting medical information to support the absence from work, as necessary, and for receiving clearance from Health Services prior to returning to work, as necessary." [35-6, at 1.] The policy does not say that an employee is entitled to lay himself or herself off indefinitely, or that an employee is protected from termination while on a leave of absence.

Regarding the collective bargaining agreement, Plaintiff cites to Rule 21, entitled "Leave of Absence," which says,

> When the requirements of the service permit, employees on written request will be granted written leave of absence for a limited time with privilege of renewal, [a] copy of which will be furnished to the Local Chairman. Employees who do not return from an authorized leave of absence within three (3) days after the expiration of said authorized leave, or who engage in other employment while on leave, will forfeit their seniority unless special provisions are made by the proper official and committee prior to the expiration of leave or knowledge of other employment.

[35-13, at 16.] Again, this provision does not give employees the right to take indefinite leaves of absence, nor does it protect them from termination while on a leave of absence. Regardless, Plaintiff does not provide any documentation showing that he requested a leave of absence pursuant to this rule, or that any such leave of absence was authorized.

Plaintiff also relies on his own testimony and that of Jennifer Nelson (a Nurse Consultant for Defendant in its Health Services Department) to support his allegation that Defendant's

6

policies allowed him to remove himself from service for indefinite periods of time. [39, ¶ 11.] But the cited exhibits do not support this allegation. First, Plaintiff's testimony only shows his understanding that the Carman position was governed by a collective bargaining agreement. [44-1, at 2.] Second, Ms. Nelson testified at her deposition that during a phone call with Plaintiff on November 8, 2012, Plaintiff told her "that he was not ready to come back to work, that he was going to remove himself from service and that he wasn't going to come back to work for some time," and she "advised him that if he was removing himself from service, that he would need to call the appropriate people [f]or layoff as is expected for his position." [39-3, at 12.] This testimony does not establish Plaintiff's right to self-impose an indefinite leave of absence or that Plaintiff was protected from termination while on his leave of absence; it accords with Defendant's written policy detailing an employee's obligations regarding medical-related leaves of absence.

The parties do not disagree as to the content of the applicable provisions. The only disagreement relates to Plaintiff's argument that these provisions gave him the "right" to an indefinite leave of absence, pursuant to which his job was "protected" while he was on leave. Despite Plaintiff's own testimony that he "thought [he] was protected by being under medical care" and that he did not know that he could be fired while under medical care [see 45, at 6], there is no evidence that Defendant authorized an approved indefinite leave of this nature. To the contrary, the undisputed portions of the evidence establish only that Defendant was aware of Plaintiff's medical leave, and the parties communicated regularly on the matter. As a prime example, on January 22, 2013 (just two weeks before Plaintiff's termination), Defendant sent Plaintiff a letter explaining that it had received a medical update from Plaintiff's physician and requesting another update in 30–45 days. [39-3, at 17.] Plaintiff describes this communication as

7

one "[p]ursuant to [Plaintiff's] approved indefinite leave;" Defendant denies Plaintiff's reading of the letter, claiming that the letter *acknowledges* (not authorizes) Plaintiff's indefinite leave of absence.

In short, the parties do not dispute the existence of these policies, and thus the Court can consider them in deciding this motion. And to the extent that Plaintiff's factual assertions [see 45, ¶¶ 9–16] regarding these documents are not supported by the documents and testimony cited in support of those assertions, they are not proper factual statements under L.R. 56.1, and thus cannot form the basis of a disputed issue of fact for summary judgment purposes. See *Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.3d 707, 711 (7th Cir. 2015) ("[T]he district court did not abuse its discretion in disregarding the facts contained in Friend's statement of additional facts that were not supported by proper citations to the record."); *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) ("[W]e have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment.").

## II. Legal Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also *Sallenger v. City of Springfield, Ill.*, 630 F. 3d 499, 503 (7th Cir. 2010) (citing Fed. R. Civ. P. 56(c)(2) and noting that summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law"). In determining whether summary judgment is appropriate, the court should construe all facts and reasonable

inferences in the light most favorable to the non-moving party. See *Carter v. City of Milwaukee*, 743 F. 3d 540, 543 (7th Cir. 2014). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Put another way, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

To avoid summary judgment, the opposing party then must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Koszola v. Bd. of Educ. of City of Chi.*, 385 F. 3d 1104, 1111 (7th Cir. 2004). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

No heightened standard of summary judgment exists in employment discrimination cases, nor is there a separate rule of civil procedure governing summary judgment in employment cases. *Alexander v. Wisc. Dep't of Health & Family Servs.,* 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997)). However, intent and credibility frequently are critical issues in employment cases that in many instances are genuinely contestable and not appropriate for a court to decide on summary

judgment. See *id.* Nevertheless, summary judgment in favor of the defendant is hardly unknown or, for that matter, rare in employment discrimination cases. *Wallace*, 103 F.3d at 1396.

**III.   Analysis**

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to * * * discharge of employees." 42 U.S.C. § 12112(a). A plaintiff claiming disparate treatment or failure to accommodate in violation of the ADA "can rely on two different methods of proof to survive a summary judgment motion"—a direct method and an indirect method. *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014); *Taylor-Novotny v. Health Alliance Medical Plans, Inc.*, 772 F.3d 478, 488–89 (7th Cir. 2014); see also *Hooper v. Proctor Health Care Inc.*, --- F.3d ---, 2015 WL 6445494 (7th Cir. Oct. 26, 2015) ("[T]he ultimate question under both methods * * * is 'whether a reasonable jury could find prohibited discrimination.'" (quoting *Bass v. Joliet Pub. Sch. Dist No. 86*, 746 F.3d 835, 840 (7th Cir. 2014))).

Under the direct method, "a plaintiff must show that a genuine issue of material fact exists with respect to each of the three elements he will eventually be required to prove at trial: (1) that the plaintiff is disabled within the meaning of the ADA; (2) that the plaintiff is qualified to perform the essential functions of the job with or without accommodation; and (3) that the plaintiff has suffered an adverse employment action because of his disability." *Bunn*, 753 F.3d at 683; *Taylor-Novotny*, 772 F.3d at 489.

Under the indirect method, a plaintiff must establish that: (1) he was a qualified individual with a disability within the meaning of the ADA; (2) he was meeting his employer's legitimate expectations; (3) he nevertheless suffered an adverse employment action; and (4) similarly situated, non-disabled employees were treated more favorably. See *Taylor-Novotny*,

10

772 F.3d at 489 (citing *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1127 (7th Cir. 2006); *Bunn*, 753 F.3d at 685).

Defendant's summary judgment motion is narrow, as it focuses solely on the issue of whether Plaintiff was a qualified individual.[6] Under the direct method, a "qualified individual" is one who is qualified to perform the essential functions of his job with or without accommodation. *Bunn*, 753 F.3d at 683; *Taylor-Novotny*, 772 F.3d at 489. Similarly, under the indirect method, a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8) (emphasis added). In other words, the same inquiry exists in both the direct and indirect tests. And "[t]o determine whether a job function is essential, we look to the employer's judgment, written job descriptions, the amount of time spent on the function, and the experience of those who previously or currently hold the position." *Rooney v. Koch Air, LLC*, 410 F.3d 376, 382 (7th Cir. 2005) (citing 29 C.F.R. § 1630.2(n)(3))); *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 534 (7th Cir. 2013) (same). Courts also consider the plaintiff's testimony as to his own job requirements, as well as the testimony of others with knowledge of the job requirements at issue. *Rooney*, 410 F.3d at 382. The Court examines each inquiry in turn.

### A. Whether Plaintiff Could Perform His Essential Job Functions Without Accommodation

#### 1. Plaintiff's Admission

Plaintiff admits that he could not perform the functions of his own job during his leaves of absence without a reasonable accommodation. [38, ¶ 40.] This admission stems from testimony that Plaintiff gave in his deposition:

---

[6] Defendant does not concede the remaining elements; it just does not raise them for purposes of this motion.

> Q. Paragraph 11 of your lawsuit says, "Mr. Quintero could perform the essential functions of his position of carman with or without reasonable accommodation." Does that paragraph have any meaning to you?
>
> * * *
>
> A. I don't agree with that, what it says in that paper.
>
> Q. For Paragraph 11?
>
> A. That's correct.
>
> Q. And why don't you agree with that?
>
> A. It says without reasonable accommodation, with or without.
>
> Q. And so it's inaccurate because you wouldn't have been able to perform the essential functions of your job without the accommodation, correct[?]
>
> A. At that time, that's correct.
>
> Q. Because your symptoms were so severe, correct?
>
> A. Correct.
>
> Q. And you had to be off work, correct?
>
> A. Yes.

[35-1, at 49–50.] Because Plaintiff admitted to this fact (both in his deposition and, more importantly, as part of his response to Defendant's statement of material facts pursuant to Local Rule 56.1), the Court's inquiry could end here.

But Plaintiff tries to work around this admission by referencing a different portion of his deposition testimony where he stated that he *was* capable of performing the "essential functions" of the "carman" position *as listed on a one-page document describing the Carman position*. [35-2, at 1.] That one-page document is divided into three sections: (1) description of duties, (2) essential functions/requirements, and (3) a section titled "On the job you would." Plaintiff highlights the "essential functions/requirements" section (because its title happens to align with the "essential functions" terminology used in the ADA context), which includes mostly administrative and safety-related requirements: securing transportation to and from work; wearing safety equipment (boots, safety glasses, hard hat, etc.); passing a pre-employment

physical examination including a drug screen, audiogram, and color vision test; possessing reading and comprehension skills to ensure compliance with certain written regulations; and maintaining a valid driver's license. [35-2, at 1.] In his deposition, Plaintiff confirmed that he was capable of putting on boots, hearing protection, safety glasses, work gloves, and a hard hat; that he could have taken a taxi to work if he could have afforded it; and that he could have taken a color vision test and an audiogram. [39-4, at 4–7.] Plaintiff argues, therefore, that Plaintiff was able to perform the "essential functions" of his job.[7]

While written job descriptions are useful in assessing the "essential functions" of a particular position, see *Rooney*, 410 F.3d at 382, the unfortunately-named "essential functions" list that Plaintiff cites hardly represents the essential functions of a Carman. As just one example, that same one-page document lists a number of tasks performed "on the job" by Carmen, including numerous physical demands (working in extreme temperatures, crawling, climbing, carrying 50–100 pounds, etc.), technical demands (operating a forklift, using both hands to grasp and manipulate tools, using both feet to operate foot controls, etc.), and mental demands (being subjected to constant noise, being subjected to long work hours, responding to emergencies, etc.) required of a Carman. These are the types of "essential functions" that matter in the legal sense—*i.e.*, those tasks that Plaintiff could be called on to perform while undertaking his job as a Carman. And Plaintiff admits that he was unable to perform the day-to-day tasks required of him as a Carman without reasonable accommodation. In short, Plaintiff's confirmation that he was capable of wearing safety equipment and calling a taxi in no way trumps his candid concession that he was unable to perform his job without accommodation.

---

[7] Technically, Plaintiff did not address each of the items listed under the "essential functions" section of that one-page document in his deposition.

Plaintiff also references a detailed, three-page description of the Carman position from the governing collective bargaining agreement as evidence that he could perform the essential functions of the job of Carman. This job description, summarized in the statement of facts, includes a lengthy list of labor-intensive tasks related to rail cars (inspecting, building, repairing, maintaining, and upgrading rail cars, etc.), but it is not necessary to discuss that list in any further detail here because Plaintiff never testified that he was able to perform all of the functions listed in those pages while he was on his leaves of absence. Instead, Plaintiff's testimony was that, as a Carman, he did not perform every job function listed in that description *on a daily basis*. [39-4, at 191–93.] But that observation does not impact Plaintiff's wider admission that, on the whole, he was unable to perform his job without accommodation. See *Winfrey v. City of Chicago*, 259 F.3d 610, 616 (7th Cir. 2001) ("[S]howing that not all employees perform at a particular time all the essential job functions does not make those functions non-essential."); *Basith v. Cook County*, 241 F.3d 919, 929 (7th Cir. 2001) (functions may be "essential" even if not performed frequently, as long as they serve a valid employer interest).

Plaintiff is unable to show that a genuine issue of material fact exists with respect to whether he was able to perform his job without accommodation.

### 2. Indefinite Leave of Absence

Defendant also cites to Plaintiff's indefinite leave of absence (*i.e.*, lack of attendance) as an alternative means of showing that Plaintiff was unable to perform his job *without* accommodation. "An employer is generally permitted to treat regular attendance as an essential job requirement and need not accommodate erratic or unreliable attendance." *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013) (citing *EEOC v. Yellow Freight System, Inc.*, 253 F.3d 943, 948–49 (7th Cir. 2001)). "A plaintiff whose disability prevents [him] from coming

to work regularly cannot perform the essential functions of [his] job, and thus cannot be a qualified individual for ADA purposes." *Id.* (citing *Waggoner v. Olin Corp.*, 169 F.3d 481, 848–85 (7th Cir. 1999)); see also *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003) ("Inability to work for a multi-month period removes a person from the class protected by the ADA.").

Here, Plaintiff took a four-month leave of absence (June 21, 2012 to November 3, 2012), returned to work for one day, and then began a second leave of absence that lasted another three months (November 8, 2012 to February 4, 2013), up until Defendant terminated Plaintiff's employment. The parties agree that Plaintiff was not fit to work without accommodation until approximately one year after his termination, in January or February of 2014. In all, Plaintiff's disability rendered him unable to perform his essential job functions for seven consecutive months prior to his termination, and approximately 18 consecutive months in total. Importantly, Plaintiff's leaves of absence were indefinite—he was seen regularly by physicians to monitor his ability to work, but no definite (or even approximate) date of return was ever communicated to Defendant. Because Defendant was unable to work, he was not a qualified individual.

Plaintiff attempts to sidestep this rather clear legal principle by arguing that Defendant's policies [35-6, at 1–4], and the policies of the governing collective bargaining agreement [35-13, at 16], gave Plaintiff the right to take an indefinite leave of absence. In other words, Plaintiff argues that, based on these leave-of-absence policies, regular attendance was not an essential function of his employment. The Court disagrees. As explained in detail in the background section above, the cited policies simply outline the procedures governing medical-related leaves of absence. Nowhere in the cited policies does it say that an employee is "protected" from termination while on an indefinite leave of absence. While it is conceivable that an employer

15

could extend certain assurances to an employee regarding job security while the employee is on medical leave, that is not the case here. There is no evidence that Plaintiff was on an approved indefinite leave of absence that protected him from termination. As such, Plaintiff's lack of attendance provides a secondary means of showing that Plaintiff was unable to perform his job *without* accommodation.

### B. Whether Plaintiff Could Perform His Essential Job Functions With Accommodation

Plaintiff alleges that he could have performed his essential job functions if permitted to take an indefinite leave of absence, or if allowed to take breaks whenever he had a bout of anxiety. "In response to an employer's motion for summary judgment, it is the plaintiff's burden to produce evidence sufficient to permit a jury to conclude that [he] would have been able to perform the essential functions of [his] job with a reasonable accommodation." *Basden v. Prof'l Transp., Inc.*, 714 F.3d at 1037 (citing *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 863–64 (7th Cir. 2005)).

As a preliminary matter, there is no evidence that Plaintiff requested a reasonable accommodation from Defendant. Defendant invokes a prior opinion of this Court, where the Court mentioned that "is aware of no case in which a failure to accommodate was successfully argued without an accompanying request to accommodate," noting that "the case law in this realm presupposes a request." *Johns v. Amtrak Police Unit*, 2009 WL 691281, at *7 (N.D. Ill. Mar. 16, 2009) (citing *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 632–33 (7th Cir. 1998) (describing the making of accommodations in ADA employment cases as an "interactive process")). In addition, the Seventh Circuit teaches that determining whether a *requested* accommodation is reasonable "is highly fact specific, and determined on a case-by-case basis by balancing the cost to the defendant and the benefit to the Plaintiff." *Dadian v. Vill. of Wilmette*,

269 F.3d 831, 838 (7th Cir. 2009); *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 848 (7th Cir. 1999) (noting that a "*refusal* to make a reasonable accommodation" is a basis for liability under the ADA) (emphasis added).

Plaintiff concedes that he never formally requested an accommodation. Instead, he claims that he was never told, and never knew, that employees could request or receive a reasonable accommodation under the ADA. Alternatively, Plaintiff testified at his deposition that the accommodation that he needed was an indefinite leave of absence [38, at 17], and he now argues that his multiple requests to be put on medical leave could be construed as such a request. In addition, in briefing the present motion, Plaintiff now claims that a reasonable accommodation would have been to allow him to take a break when he had a bout of anxiety, although he concedes that he never communicated this request to Defendant either.

Because Plaintiff never requested a reasonable accommodation, Defendant couldn't possibly have *refused* one, as is necessary for liability under the ADA. See *Washington*, 181 F.3d at 848. Nor was there any "interactive process" between the parties, wherein they discussed Plaintiff's need for accommodation and Defendant's response to that need. See *Baert*, 149 F.3d at 632–33. For this reason, Plaintiff's accommodation claim cannot succeed. Nonetheless, the Court will assess the merits of Plaintiff's *post hoc* requests for accommodation.

As to Plaintiff's first proposed accommodation, an indefinite leave of absence is not a reasonable accommodation under the ADA. See *Byrne*, 328 F.3d at 381 ("But Byrne did not want a few days off or a part-time position; his only proposed accommodation is not working for an extended time, which as far as the ADA is concerned confesses that he was not a 'qualified individual' * * *."); *Waggoner v. Olin Corp.*, 169 F.3d 481, 482 (7th Cir. 1999) ("The rather

17

common-sense idea is that if one is not able to be at work, one cannot be a qualified individual.").

As to Plaintiff's second proposed accommodation, allowing Plaintiff to take breaks whenever he had a bout of anxiety is not a reasonable accommodation under the facts of this case. Plaintiff had multiple panic attacks on a daily basis, during which he was unable to move, his hands shook, he felt like he couldn't breathe and he was "going nuts," he could not think, and he felt like he was going to have a heart attack. During his daily duties as a Carman, Plaintiff would inspect (and, in some instances, repair) anywhere from 900 to 1500 rail cars, usually by himself, or sometimes working in pairs. In Plaintiff's own words, a Carman is a "safety sensitive" position, meaning that Carmen need to stay alert at all times to ensure safety of themselves and others. Not surprisingly, then, Plaintiff himself testified that he thought that he needed an indefinite leave of absence until he was ready to come back to work. [38, ¶ 41.] There is simply no evidence, medical or otherwise, indicating that Plaintiff could have performed the essential functions of his job had he been able to take multiple, random, indefinite breaks every day. Nor would such an accommodation be reasonable under the facts of this case, based on the severity of Plaintiff's attacks, the physical and mental demands of a Carman, the unpredictability of the timing and duration of any given panic attack, the fact that Plaintiff could only sense an oncoming panic attack "sometimes," and the overall safety concerns of being a Carman.

Accordingly, Plaintiff has failed to meet his burden to produce evidence sufficient to permit a jury to conclude that he would have been able to perform the essential functions of his job with a reasonable accommodation.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment [33] is granted. Judgment will be entered in favor of Defendant.

Dated: November 2, 2015

_____
Robert M. Dow, Jr.
United States District Judge